## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ELEMENT BIOSCIENCES, INC., | |
| Plaintiff, | |
| v. | C.A. No. 25-1175-JLH-EGT |
| ILLUMINA, INC., | |
| Defendant. | |

## ILLUMINA'S OPENING BRIEF IN SUPPORT OF ITS MOTION TO DISMISS UNDER FED. R. CIV. P. 12(b)(6)

*Of Counsel*:

Keith R. Hummel
Sharonmoyee Goswami
Jonathan D. Mooney
CRAVATH, SWAINE & MOORE LLP
Two Manhattan West
375 Ninth Avenue
New York, NY 10001
(212) 474-1000
khummel@cravath.com
sgoswami@cravath.com
jmooney@cravath.com

Kelly E. Farnan (#4395)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
(302) 651-7700
farnan@rlf.com

*Attorneys for Defendant*
*Illumina, Inc.*

Dated: November 24, 2025

## <u>TABLE OF CONTENTS</u>

I.   NATURE AND STAGE OF THE PROCEEDINGS ........................................................1

II.  SUMMARY OF THE ARGUMENT .........................................................................1

III. STATEMENT OF FACTS ........................................................................................3

IV.  ARGUMENT ...........................................................................................................10

     A.   Legal Standards ...........................................................................................10

     B.   Alice Step One: The '161 Patent is Directed to Abstract Ideas, which
          are Patent-Ineligible Concepts. .................................................................12

     C.   Alice Step Two: The Claims Lack an Inventive Concept Beyond the
          Abstract Algorithms. ..................................................................................16

V.   CONCLUSION .......................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Accenture Glob. Servs., GmbH v. Guidewire Software, Inc.*,
    728 F.3d 1336 (Fed. Cir. 2013) .................................................................................10

*Alice Corp. v. CLS Bank Int'l*,
    573 U.S. 208 (2014) ........................................................................................... passim

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) .................................................................................................10

*Bilski v. Kappos*,
    561 U.S. 593 (2010) ...............................................................................................2, 13

*BSG Tech LLC v. BuySeasons, Inc.*,
    899 F.3d 1281 (Fed. Cir. 2018) ...........................................................................11, 20

*buySAFE, Inc. v. Google Inc.*,
    964 F.Supp.2d 331 (D. Del. 2013), *aff'd*, 765 F.3d 1350 (Fed. Cir. 2014) .............15

*CareDx, Inc. v. Natera, Inc.*,
    40 F.4th 1371 (Fed. Cir. 2022) .................................................................................18

*ChargePoint, Inc. v. SemaConnect, Inc.*,
    920 F.3d 759 (Fed. Cir. 2019) .............................................................................10, 11

*Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*,
    776 F.3d 1343 (Fed. Cir. 2014) ...........................................................................10, 17

*Credit Acceptance Corp. v. Westlake Servs.*,
    859 F.3d 1044 (Fed. Cir. 2017) ................................................................................13

*Customedia Techs., LLC v. Dish Network Corp.*,
    951 F.3d 1359 (Fed. Cir. 2020) ................................................................................11

*Cybergenetics Corp. v. Institute of Environmental Science and Research*,
    490 F.Supp.3d 1237 (N.D. Ohio 2020), *aff'd without op.* 856 Fed. App'x. 312
    (Fed. Cir. 2021)
    .................................................................................................................................13

*CyberSource Corp. v. Retail Decisions, Inc.*,
    654 F.3d 1366 (Fed. Cir. 2011) ................................................................................15

*Digitech Image Techs., LLC v. Elecs. for Imaging, Inc.*,
    758 F.3d 1344 (Fed. Cir. 2014) ................................................................................14

ii

*Epic IP LLC v. Backblaze, Inc.*,
  351 F.Supp.3d 733 (D. Del. 2018) ....................................................................11

*FairWarning IP, LLC v. Iatric Systems, Inc.*,
  839 F.3d 1089 (Fed. Cir. 2016) .......................................................................11

*Genetic Technologies, Ltd. v. Merial L.L.C.*,
  818 F.3d 1369 (Fed. Cir. 2016) ..................................................................17, 18

*Gottschalk v. Benson*,
  409 U.S. 63 (1972) .........................................................................................12

*In re Bd. of Trustees of Leland Stanford Junior Univ.*,
  991 F.3d 1245 (Fed. Cir. 2021) .......................................................................14

*In re Richman*,
  563 F.2d 1026 (C.C.P.A. 1977) .......................................................................12

*In re TLI Commc'ns LLC Pat. Litig.*,
  823 F.3d 607 (Fed Cir. 2016) ..........................................................................11

*Mayo Collaborative Servs. v. Prometheus Lab'ys, Inc.*,
  566 U.S. 66 (2012) .........................................................................................10

*Parker v. Flook*,
  437 U.S. 584 (1978) .......................................................................................12

*RecogniCorp, LLC v. Nintendo Co., Ltd.*,
  855 F.3d 1322 (Fed. Cir. 2017) .......................................................................14

*Sandbox Software, LLC v. 18Birdies, LLC*,
  C.A. No. 18-1649 (MN), 2019 WL 2524780 (D. Del. June 19, 2019) ...................10

*Yu v. Apple Inc.*,
  1 F.4th 1040 (Fed. Cir. 2021) ..........................................................................11

**Statutes & Rules**

35 U.S.C. § 101 ........................................................................................ passim

Fed. R. Civ. P. 8(a) ...........................................................................................10

Fed. R. Civ. P. 12(b)(6) .............................................................................1, 10, 20

**Other Authorities**

Helmy Eltoukhy & Abbas El Gamal, "Modeling and Base-Calling for DNA
      Sequencing-By-Synthesis", in 2006 IEEE INTERNATIONAL CONFERENCE ON
      ACOUSTICS SPEECH AND SIGNAL PROCESSING PROCEEDINGS 2: 1032 (2006)............................5

Turcatti et al., A new class of cleavable fluorescent nucleotides: synthesis and
      optimization as reversible terminators for DNA sequencing by synthesis, Nucleic
      Acids Rsch., 36(4):e25 (2008) at 2 ................................................................................18

U.S. Patent No. 6,664,079.................................................................................................17

U.S. Patent No. 8,612,161............................................................................................. passim

## I.    NATURE AND STAGE OF THE PROCEEDINGS

This is a patent case.  Element filed its complaint on September 22, 2025, asserting U.S. Patent No. 8,612,161 (the "'161 Patent" or "the patent") and three other patents against Illumina. Illumina brings this motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure on the grounds that each claim of the '161 Patent is directed to the use of an algorithm for performing numerical computations on collected sequencing data—a paradigmatic case of an abstract idea that falls outside the bounds of patent eligibility under 35 U.S.C. § 101.  The claims of the '161 Patent are therefore invalid as a matter of law, and Element's claim for infringement of that patent does not state a claim upon which relief can be granted and should be dismissed.

## II.    SUMMARY OF THE ARGUMENT

1.      The '161 Patent is directed to algorithms for processing data obtained from gene sequencing instruments, specifically those that perform sequencing-by-synthesis.  The claims of the '161 Patent recite only patent ineligible abstract ideas, namely the use of software algorithms, without providing improvements to the functioning of computing or sequencing systems.  The claims of the '161 Patent are therefore invalid under Section 101 for claiming patent-ineligible subject matter.  *See Alice Corp. v. CLS Bank Int'l*, 573 U.S. 208, 217–18 (2014).

2.      The '161 Patent acknowledges that sequencing-by-synthesis technology was known ("[m]any of the next-generation sequencing technologies use a form of sequencing by synthesis") ('161 Patent, 1:18–22) and admits that it employs the use of conventional materials and equipment.  (*See, e.g.*, *id.* at 30:22–24  ("In one embodiment, the labeling (i.e. incorporation) step uses Kapa RevTerm polymerase (from Kapa Biosystems, Woburn, Mass.)"), 30:46–49 ("By way of example only, the system can employ ultra-bright LEDs (such as those available from Philips Lumileds Lighting Co., San Jose, Calif.) of different colors to excite dyes attached to the

1

arrayed nucleic acids."), 30:59–64 ("By way of example only, the system may employ a high sensitivity CCD camera (such as those available from Roper Scientific, Inc., Photometric division, Tucson Ariz. or those available from Apogee Instruments, Roseville, Calif.) to image the fluorescent dyes and make measurements of their intensity."), 240:52–53 ("The sequencing was performed in a chambered slide (Grace Biolabs)."). Thus, the '161 Patent does not provide any new, inventive technology to generate the data that is processed using the recited algorithms.

3.      Each and every claim of the '161 Patent is directed to an abstract idea without any other inventive concept. For example, independent claim 1, the only claim referenced in Element's complaint, recites obtaining data from known sequencing-by-synthesis steps, calculating a ratio from that data, and applying that ratio to other data to "determine[e] an identity of a nucleic acid". Mathematical algorithms such as those claimed by the '161 Patent are exactly the types of abstract ideas recognized by the Supreme Court as presumptively patent-ineligible. *See Bilski v. Kappos*, 561 U.S. 593, 611 (2010). Indeed, the '161 Patent admits that the claimed mathematical algorithms could be carried out by hand. ('161 Patent, 51:15–27.)

4.      The '161 Patent claims contain no inventive concept to transform its claimed abstract idea into patent eligible subject matter to overcome a presumption of unpatentability, *see Alice*, 573 U.S. at 221–22. The only non-abstract aspects recited in claims are conventional activities that—as the patent acknowledges—were known in the art.

5.      Thus, each and every claim of the '161 Patent is invalid because it is directed to patent-ineligible subject matter under Section 101. The infringement claims for this patent should be dismissed. Dismissal at this stage of the proceeding is appropriate because discovery cannot save the claims and dismissal would significantly simplify the scope of discovery in this case because this is the only patent that accuses Illumina's software of infringement.

2

### III.    STATEMENT OF FACTS

All claims of the '161 Patent recite the use of mathematical algorithms to process data obtained from sequencing-by-synthesis, a form of DNA sequencing.  Notably, the '161 Patent was issued in December 2013, six months **before** the Supreme Court decided *Alice*.

DNA sequencing is the process of determining the order of nucleotide bases that make up a strand of DNA.  In sequencing-by-synthesis, the sequence of nucleotides in a DNA strand is determined in a stepwise manner, with the addition and then identification of one nucleotide at a time.  ('161 Patent, 1:18–22.)  The '161 Patent claims various algorithms purporting to address three different phenomena associated with sequencing-by-synthesis—sequencing lead and lag, background variations in illumination and filter response, and spectral crosstalk.  Certain claims relate to only one of the three types of algorithms (*e.g.*, claim 1 relates only to sequencing lead-lag), while other claims, because they depend from other claims, relate to two of the three types of algorithms.  All of the claims are directed solely to patent-ineligible mathematical algorithms.

**<u>Sequencing Lead-Lag Algorithms</u>**.  The first set of algorithms is related to the phenomenon of sequencing lead and lag, for which **claim 1** is a representative claim.

**Claim 1** reads as follows:

1. A method for determining an identity of a nucleic acid at an interrogation position in a nucleotide sequence from data acquired from one or more channels in parallel, comprising:

> a) sequencing a nucleic acid by DNA sequencing by synthesis utilizing nucleotides with fluorescent dyes which are incorporated into a complementary strand,

> b) obtaining a data set for one or more dye intensities at one or more nucleic acid positions in said complementary sequence, wherein each dye corresponds to a nucleotide,

> c) determining the ratio contribution to dye intensity at said interrogation position from dye intensities at the interrogation position and at one or both of

3

> i) at least one subsequent nucleic acid positions in said complementary sequence, and
>
> ii) at least one preceding nucleic acid positions in said complementary sequence, and
>
> d) applying said ratio contribution to said data set to arrive at an identity for a nucleotide at said interrogation position in said nucleotide sequence.

The only non-abstract aspects of claim 1 are found in steps (a) and (b), which relate to performing sequencing-by-synthesis and obtaining sequencing data. The '161 Patent describes sequencing-by-synthesis in the following manner:

> "In sequencing by synthesis, nucleotides conjugated with fluorescent markers that incorporate into a growing double-stranded nucleic acid from the single strand are detected. . . . One detects nucleotide incorporation using a laser microarray scanner or fluorescent microscope by correlating a particular fluorescent marker to a specific nucleotide."

('161 Patent, 28:12–23). In other words, a nucleotide is added to a DNA strand and its identity is determined by detecting the color of a fluorescent dye associated with the nucleotide. The dyes, also referred to in the patent as markers, moieties, labels or probes, correspond to the four possible nucleotide bases in DNA, *i.e.*, adenine (A), guanine (G), cytosine (C) and thymine (T).

However, it is beyond dispute that steps (a) and (b) describe conventional sequencing-by-synthesis steps that were known in the art. The '161 Patent admits that using sequencing-by-synthesis as a method to identify the nucleotide base pairs in a DNA strand was known in the prior art, citing Metzker, Genome Res. (2005) 15(12): 1767-1776; Shendure et al. (2004) Nature Reviews Genetics 5: 335-344; U.S. Pat. No. 6,664,079 to Ju et al.; and Ruparel et al. (2005) Proc. Natl. Acad. Sci. 102(17) 5932-7. ('161 Patent, 27:58–64, 32:45–47, 32:56–59.) Each of these references describes sequencing-by-synthesis in the same way as the '161 Patent.

The remaining steps of claim 1, steps (c) and (d), recite a mathematical algorithm that purportedly addresses sequencing lead-lag. The patent describes the sequencing lead-lag

4

phenomenon as follows: "Many next-generation DNA sequencing systems read the sequence of millions of different single-stranded DNA fragments in parallel by using a polymerase enzyme to incorporate fluorescently labeled DNA nucleotides into the complementary strand one cycle at a time. However, incorporation errors can shift the phase of some of the templates, so base read outs may lead ahead or lag behind the cycle number." ('161 Patent, 40:2–8.) In other words, the nucleotide read in any one step in the sequencing process may actually be from before or after the target nucleotide.[1] The '161 Patent describes using a straightforward math equation to account for this effect: "Because of impurities, limited polymerase efficiencies and other errors, some of the templates within an ensemble may get out of phase with the cycle number. For example, the base that is incorporated in the $i$th cycle may be complementary to the $i-1$st position or the $i+1$st position in the template rather than the expected $i$th position. The invention's methods provide ***computational re-phasing*** of the dephased data." ( *Id.* at 40:38–44) (emphasis added).) All this algorithm does is calculate a ratio comparing the intensity of the dyes collected from the known sequencing steps, and apply the ratio to the data set as a "correction".

**Field-Flattening Algorithms**. The second set of algorithms purports to address the phenomenon of background variations in illumination and filter response, that is, background "noise" in the images taken of the fluorescent markers. For these algorithms, **claim 14** is representative and is reproduced below along with claim 13 from which it depends.

> 13. The method of claim 1, further comprising field flattening of background data for said data set.

---

[1] The sequence lead-lag phenomenon was known in the art as shown, for example, by Helmy Eltoukhy & Abbas El Gamal, "Modeling and Base-Calling for DNA Sequencing-By-Synthesis", in 2006 IEEE INTERNATIONAL CONFERENCE ON ACOUSTICS SPEECH AND SIGNAL PROCESSING PROCEEDINGS 2: 1032, 1032 (2006) ("some copies [of the template strand] do not incorporate the added base when they should" leading to *desynchrony* in the read position of different strands"), which the '161 Patent incorporates by reference, '161 Patent, 1:34–36, 246:37–38.

14. The method of claim 13, wherein said field flattening comprises

a) obtaining a first data set for a plurality of pixel intensities of a first raw image of a dye at a first concentration on a solid support, wherein said first raw image is produced using a first spectral filter for detecting a first dye,

b) obtaining a second data set for a plurality of pixel intensities of a second smoothed image of said dye on said solid support, wherein said second smoothed image is produced using a low pass filter,

c) determining a field flattening intensity value for a plurality of pixels of said first raw image, and

d) generating a third field flattened image of said dye on said solid support using said field flattening intensity of said plurality of pixels, wherein the correlation of intensity of a plurality of pixels to their spatial location on said third field flattened image is reduced compared to the intensity of a plurality of pixels at a corresponding location on said first raw image.

Claim 14 ultimately depends from claim 1, and does not recite any non-abstract steps beyond the conventional sequencing-by-synthesis chemistry recited by claim 1. The claim's purportedly novel aspect is certain "algorithms and equations for field flattening", which addresses variations in the perceived brightness of an image, as captured by a camera in the form of pixels, based on location across a surface. ('161 Patent, 46:60–66, 26:42–45.) According to the '161 Patent, "variations in illumination and filter response produce a significant spatially correlated pattern in an image [and] . . . the pattern is highly reproducible and has a linear response to changes in dye concentration and camera exposure." (*Id.* at 46:37–41.) The patent discloses, and claim 14 recites, an "***algorithm*** for removing this spatial correlation between pixel intensity and location of the pixel on the solid substrate." (*Id.* at 46:42–44 (emphasis added).)

**Spectral Cross-Talk Algorithms**. The third set of algorithms purport to address the phenomenon of "spectral crosstalk". For these algorithms, **claim 21** is representative and is reproduced below along with claim 20 from which it depends.

20. The method of claim 1, further comprising reducing spectral crosstalk in said one or more channels.

6

21. The method of claim 20, wherein said reducing spectral crosstalk comprises

a) determining spectral crosstalk factors for each of said one or more dyes in its corresponding channel from one or more adjacent channels,

b) applying said spectral crosstalk factors to determine a spectral crosstalk matrix, and

c) applying said spectral crosstalk matrix to said data set for said one or more dye intensities.

Claim 21 ultimately depends from claim 1, and does not add any non-abstract steps beyond the conventional sequencing-by-synthesis chemistry recited by claim 1. The claim's purportedly novel aspect is a method of addressing spectral crosstalk, although the patent recognizes that such algorithms were already known in the field. According to the '161 Patent, the phenomenon of spectral crosstalk or color crosstalk "refer[s] to any phenomenon by which a spectral signal, or a digital signal that corresponds to a spectral signal, that is transmitted and measured in one channel of transmission creates an undesired effect in another channel. For example, spectral crosstalk may occur when exciting only a green dye, resulting in a signal that is visible in the yellow channel as well as in the green channel." ('161 Patent, 27:17–23.)

The '161 Patent then exemplifies its claimed algorithmic methods with equations and states that "*[a]ny multicolor sequencing by synthesis device may be calibrated using the above equations* and the resultant spectral crosstalk matrix may be used in all four color measurements from the device. In one embodiment, if we also include information on the relative magnitude of each of the four colors, then we can also correct for differences in perceived dye brightness from one channel to the next. Multiplying the matrix K by a diagonal matrix, whose diagonal terms are the relative brightness for each dye, produces a new matrix K whose inverse will automatically scale the dyes to be consistent with one another." (*Id.* at 51:31–42 (emphasis added).) The '161 Patent explains that though the solution to these computations "***may be***

*written out*", the computation "is somewhat complex and is best performed by plugging in the numbers and letting the computer take the inverse". (*Id.* at 51:24-27 (emphasis added).)

*    *    *

The remaining claims of the '161 Patent do not add anything to the representative claims 1, 14 and 21 that would affect the Section 101 analysis.

<u>**Claim 1**</u> is representative of claims 2–12, 26–30, which all cover the basic idea of calculating a "ratio contribution" using a "data set for one or more dye intensities at one or more nucleic acid positions" and "applying said ratio contribution to said data set to arrive at an identity for a nucleotide". These are simply variations of the algorithm recited by claim 1 for addressing the sequencing "lead-lag" phenomenon. To be more specific, **claims 2–4** depend from claim 1 and additionally require a more particular way of determining the ratio contribution for the nucleotide dyes. **Claim 5** depends from claim 1 and requires "calling a nucleic acid base at said interrogation position" which is similar or identical to what claim 1 already requires by reciting "arrive at an identity for a nucleotide at said interrogation position".[2] **Claim 6** depends from claim 1 and merely requires repeating steps of the same algorithm for multiple nucleotides. **Claims 7–11** depend from claim 1 and further recite the use of specific equations to determine the ratio contribution of the dyes. **Claim 12** depends from claim 1 and merely requires the sequencing of all four possible nucleotide bases of which DNA is composed (A, G, C and T). **Claim 26** is essentially duplicative of claim 1 but expressly recites "data processing" steps, and adds another step to the algorithm where the intensity data from the dyes is "reconstructed" after

---

[2] As the specification explains, "calling" a nucleotide base means to "determine the most likely base". ('161 Patent at 52:2–5.) Calling a nucleic acid base at the interrogation position therefore refers to determining the identity of the nucleic acid at the position of interest. (*Id.* at 26:5–8 ("'interrogation position' . . . refers to a location of interest in the sequence, such as the location *at which the identity of a nucleic acid is sought to be determined*." (emphasis added)).)

8

the phasing compensation is applied.  **Claims 27–30** depend from claim 26 and contain similar limitations to claims 8–11.  **Claim 33** is written as a means-plus-function claim, but encompasses the same steps as claim 1.  **Claim 36** is written as a system claim that recites a computer readable medium containing code for determining the identity of a nucleic acid within a sequence using fluorescent nucleotides, which may involve carrying out the method recited in claim 1.

_**Claim 14**_ is representative of claims 13 and 15–19.  Claim 14 is directed to field flattening of background data for the data set described in claim 1.  It is representative of **claim 13** because it depends from it (which, in turn, depends from claim 1).  **Claim 15** recites the use of a specific equation for performing the claimed field flattening.  **Claims 16 and 17** are directed to repeating steps of the algorithm in claim 15 on a second set of data.  **Claims 18 and 19** merely recite the use of conventional lab equipment (_i.e._, a microscope slide and silicon) with reference to the instrument used to obtain sequencing data for the algorithms of claim 1 and 13.  **Claim 31** depends from claim 26 and contains similar limitations to claim 13.  **Claim 34** is written as a means-plus-function claim (which depends from claim 33), but encompasses the same steps as claim 13.  **Claim 37** is written as a system claim that recites a computer readable medium containing code for carrying out the method of claim 13 (and depends from claim 36).

_**Claim 21**_ is representative of claims 20 and 22–25, which are directed to algorithms for addressing spectral crosstalk.  It is representative of **claim 20** because it depends from it (which, in turn, depends on claim 1).  **Claim 22** recites a similar algorithm for addressing spectral crosstalk as claim 21, using the term "signature ratio" instead of "spectral crosstalk factors", but still recites the claim 1 element of constructing a matrix used to address the crosstalk.  **Claim 23** depends from claim 22 and merely adds the step of actually applying the matrix equation to the data.  **Claims 24 and 25** depend from claim 21 and recite the use of specific equations to

9

determine the matrix.  **Claim 32** depends from claim 26 and contains similar limitations to claim 20.  **Claim 35** is written as a means-plus-function claim (which depends from claim 33), but encompasses the same steps as claim 20.  **Claim 38** is written as a system claim that recites a conventional computer readable medium-containing code for carrying out the method of claim 20 (and depends from claim 36).

All of the claims are thus substantially similar to their representative claims and recite variations of one or more of the three algorithms discussed above, and may be analyzed together. *See, e.g.*, *Content Extraction & Transmission LLC v. Wells Fargo Bank*, *Nat'l Ass'n*, 776 F.3d 1343, 1348 (Fed. Cir. 2014).

## IV.    ARGUMENT

### A.  <u>Legal Standards</u>

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citation and quotation marks omitted); Fed. R. Civ. P. 8(a).

"Patent eligibility under § 101 presents an issue of law", *Accenture Glob. Servs., GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1340 (Fed. Cir. 2013), that can be determined under Rule 12(b)(6) when "there are no factual allegations that, taken as true, prevent resolving the eligibility question as a matter of law".  *ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 765 (Fed. Cir. 2019); *see also Sandbox Software, LLC v. 18Birdies, LLC*, C.A. No. 18-1649 (MN), 2019 WL 2524780 (D. Del. June 19, 2019) (granting Rule 12(b)(6) motion on Section 101 grounds).  To determine what is and is not patent-eligible, courts use the two-step framework outlined in *Alice Corp. v. CLS Bank International*, 573 U.S. 208, 217-18 (2014) (quoting *Mayo Collaborative Servs. v. Prometheus Lab'ys, Inc.*, 566 U.S. 66, 72-73, 77-79 (2012)).

In *Alice* step one, the court determines "whether the claims at issue are directed to a patent-ineligible concept," such as an abstract idea. *Alice*, 573 U.S. at 218. To do this, courts "look[] at the 'focus' of the claims", in light of the claim language, specification and disclosed advance over the prior art, "to ascertain whether their character as a whole is directed to excluded subject matter". *ChargePoint*, 920 F.3d at 765-66; *see also Yu v. Apple Inc.*, 1 F.4th 1040, 1043 (Fed. Cir. 2021) (at *Alice* step one, courts ask "what the patent asserts to be the focus of the claimed advance over the prior art").

If a patent claim is found to be directed to an abstract idea under *Alice* step one, then the analysis moves to *Alice* step two, which asks whether the claimed elements—"individually and 'as an ordered combination'"—recite an inventive concept sufficient to "'transform the nature of the claim' into a patent-eligible application." *Customedia Techs., LLC v. Dish Network Corp.*, 951 F.3d 1359, 1362 (Fed. Cir. 2020) (quoting *Alice*, 573 U.S. at 217). The court "looks more precisely at what the claim elements add", *id.*, at 1365, and considers whether the claim elements involve more than performance of "well-understood, routine, and conventional activities", *FairWarning IP, LLC v. Iatric Systems, Inc.*, 839 F.3d 1089, 1093 (Fed. Cir. 2016). The use of conventional computer equipment as a "conduit" for an abstract idea "does not add sufficient substance" to render an abstract idea patent-eligible. *Yu*,1 F.4th at 1045  (quoting *In re TLI Commc'ns LLC Pat. Litig.*, 823 F.3d 607, 612 (Fed Cir. 2016). To survive *Alice* step two, "the patent must "amount[] to 'significantly more' than a patent upon the ineligible concept itself." *Epic IP LLC v. Backblaze, Inc*., 351 F.Supp.3d 733, 748 (D. Del. 2018) (quoting *BSG Tech LLC v. BuySeasons, Inc.*, 899 F.3d 1281, 1289—90 (Fed. Cir. 2018)).

As set forth below, even accepting the Complaint's allegations as true, the '161 Patent is unpatentable under § 101 as a matter of law. Element's claim for infringement of that patent should be dismissed.

**B. <u>Alice Step One</u>: The '161 Patent is Directed to Abstract Ideas, which are Patent-Ineligible Concepts.**

The claims of the '161 Patent are patent ineligible, and therefore invalid, because they are directed to mathematical algorithms for "reducing and/or correcting one or more phenomena that are encountered during nucleotide sequencing, such as using sequencing by synthesis methods". ('161 Patent, 1:50–53). Each of the claims of the '161 Patent recite mathematical formulas and algorithms to be applied in the context of data processing. The focus of the inventions are mathematical algorithms applied to data generated from sequencing-by-synthesis to purportedly address three specific phenomena: (1) sequence lead and lag; (2) variations in illumination and filter response, and (3) spectral crosstalk. ('161 Patent, 1:50–56.) The steps involved in performing these operations are simply numerical computations.

The Supreme Court has long held that mathematical algorithms and formulas—even if novel or nonobvious (which these are not)—are patent-ineligible abstract ideas. "[I]f a claim is directed essentially to a method of calculating, using a mathematical formula, even if the solution is for a specific purpose, the claimed method is nonstatutory [*i.e.*, directed to subject matter beyond the scope of the patent statute]." *Parker v. Flook*, 437 U.S. 584, 595 (1978) (quoting *In re Richman*, 563 F.2d 1026, 1030 (C.C.P.A. 1977)); *see also Gottschalk v. Benson*, 409 U.S. 63, 72 (1972) (finding claims ineligible where "the patent would wholly pre-empt the mathematical formula and in practical effect would be a patent on the algorithm itself." ) Algorithms may be described conceptually or expressed as a specific formula—but both forms are abstract ideas.

12

*Bilski v. Kappos*, 561 U.S. 593, 611 (2010) ("[t]he concept of hedging, described in claim 1 and reduced to a mathematical formula in claim 4, is an unpatentable abstract idea").

Precisely the concerns that animated the Supreme Court in *Benson*, *Flook* and *Bilski* are present here. For example, representative claim 1 recites an ***algorithm*** that is directed to determining a ratio between two numbers (here, two dye intensities) and using that ratio in an equation that is applied to sequencing data to compensate for sequence lead and lag. Similarly, representative claim 14 provides a ***formula*** for field-flattening pixels in the data set to reduce background noise. The steps of claim 14 involve obtaining a numerical data set (intensities of pixel values), manipulating that data (*e.g.*, by using mathematical filters) and generating a new data set in response. And for representative claim 21, the claimed method for addressing spectral crosstalk involves determining a set of numeric factors, such as taking the ***ratio*** of two numbers.

The focus of each of these claims is, at bottom, one or more algorithms used in data processing and software.[3] Courts regularly find such claims to mathematical computations to be directed to an abstract idea under *Alice* step one. For example, in *Cybergenetics Corp. v. Institute of Environmental Science and Research*, the claims were directed to deconvolution of DNA (separating the DNA sample into individual samples). 490 F.Supp.3d 1237, 1240 (N.D. Ohio 2020), *aff'd without op.* 856 Fed. App'x. 312 (Fed. Cir. 2021). The claims at issue recited "calculating a variance from the [data in the DNA sample], using that variance and a linear [prediction] model to predict the identity of a person in a DNA sample containing multiple people, and calculating the likelihood that the prediction is correct." *Cybergenetics*, 490

---

[3] Software algorithms may be patent-eligible only when the claims are directed to improvements of the functioning to the general purpose computer, beyond just automation of manual processes. *See, e.g., Credit Acceptance Corp. v. Westlake Servs.*, 859 F.3d 1044, 1055 (Fed. Cir. 2017) ("Our prior cases have made clear that mere automation of manual processes using generic computers does not constitute a patentable improvement in computer technology.")

F.Supp.3d at 1245.  "That prediction, and its likelihood of correction, take the form of computed, numerical results."  *Id.* at 1245–46.  As here, the claims in *Cybergenetics* called for mathematical computations using equations and ratios.  *Id.* at 1246.  The court held the claims were directed to mathematical algorithms, an abstract idea under *Flook*, and ultimately granted the motion to dismiss for failure to state a claim because the patent was invalid.  *Id.* at 1247, 1257.[4]

There cannot be any doubt that the focus of the claims recited in the '161 Patent is on patent-ineligible algorithms.  (*See, e.g.*, '161 Patent, claim 1 ("obtaining a data set" and then applying the mathematical formula to that data set); *see also* claim 26 ("processing data from said one or more channels to correct for sequence lead and sequence lag"), claim 8 ("applying a sequence lead-lag compensation equation").)  While the claims also recite steps in which "DNA sequencing by synthesis utilizing nucleotides with fluorescent dyes" is performed and "a data set for one or more dye intensities at one or more nucleic acid positions" is obtained, the '161 Patent admits that such processes are not new, and thus, not the "focus" of the claims.  The '161 Patent references prior art from as early as 2005 that describes iterations of various components of sequencing-by-synthesis.  (*See, e.g.*, '161 Patent, 32:56–60 ("Cleavable fluorescent nucleotides with photo-cleavable linkers having reversible terminator allyl groups have been described in Ruparel et al. (2005) Proc. Natl. Acad. Sci. 102(17) 5932-7.  Similar, fluorescent nucleotide conjugates have been described in Bi et al. (2006) J. Am. Chem. Soc. 128(8) 2542-3.").)  The

---

[4] *See also RecogniCorp, LLC v. Nintendo Co., Ltd.*, 855 F.3d 1322, 1327 (Fed. Cir. 2017) (internal citation omitted) ("A process that started with data, added an algorithm, and ended with a new form of data was directed to an abstract idea."); *In re Bd. of Trustees of Leland Stanford Junior Univ.*, 991 F.3d 1245, 1251 (Fed. Cir. 2021) ("The different use of a mathematical calculation, even one that yields different or better results, does not render patent eligible subject matter."); *Digitech Image Techs., LLC v. Elecs. for Imaging, Inc.*, 758 F.3d 1344, 1351 (Fed. Cir. 2014) (finding generation of data by "taking existing information . . . and organizing this information into a new form" to be an ineligible abstract idea).

'161 Patent does not claim any technological improvements to the sequencing-by-synthesis

process, but recites code that is to be implemented by a general purpose computer.  (*See, e.g.*,

'161 Patent, claim 36 (claiming "code that applies to the input data a sequence lead-lag

compensation equation to correct for sequence lead and sequence lag"), claim 37 (claiming

"code that applies field flattening of background data"), claim 38 (claiming "code that reduces

spectral crosstalk between data comprised in one or more channels").)

      Further demonstrating the lack of technological improvement, the claimed mathematical

computations could be performed manually, by humans using pen and paper.  "Merely using a

computer to perform more efficiently what could otherwise be accomplished manually does not

confer patent-eligibility."  *buySAFE, Inc. v. Google Inc.*, 964 F.Supp.2d 331, 336 (D. Del. 2013),

*aff'd*, 765 F.3d 1350 (Fed. Cir. 2014); *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d

1366, 1372 (Fed. Cir. 2011) (finding unpatentable "method steps [that] can be performed in the

human mind, or by a human using a pen and paper").  The patent describes each of the three

types of algorithms in the form of equations, underscoring that these are merely mathematical

formulas.  Equations relating to sequence lead/lag are given at 44:30–45:15 (equations (4), (5)

and (6)); for field flattening at 46:45–47:3; and for spectral crosstalk at 50:47–51:27.  It is clear

from the patent itself that each of these mathematical computations could be carried out

manually by a human, although to do so efficiently, a computer would have to be used.

      For example, a human technician could take a data set output by a sequencing instrument

and manually calculate the ratio contribution between a dye intensity value for one nucleotide

and the preceding and/or subsequent nucleotides, and then apply the sequence lead-lag

compensation equation in the patent to arrive at the identity of a nucleotide.  The specification

walks through that process, beginning with computing the ratios of measured dye intensity and

actual dye intensities for several cycles in a sequencing process.  ('161 Patent, 41:17–23.)  With this information, the sequence lead and lag rates in the collected data can be calculated using equations 1 and 2 in the specification.  (*Id.* at 41:61–42:6, 42:64–43:10).  These values may be computed for an "initial draft sequence" and then applied to all cycles.  (*Id.* at 43:38–42.)  The patent explains that to do this, "[w]e constructed a matrix equation that describes a model for the reduced measured signal $I_{Mi}$, from the lead and lag effect in the i$^{th}$ cycle . . . for all cycles".  (*Id.* at 44:30–33.)  A human could solve these equations manually, to determine the appropriate rates, and use these figures to construct the matrix equation to be applied.  As the patent notes, the scope of the problem is simplified because "[i]n most systems, the terms with k [the number of positions between the nucleotide at the interrogation position and a preceding or subsequent nucleotide] greater than about 4 . . . are negligible."  (*Id.* at 44:65–45:1.)  Similarly, the patent explains for spectral crosstalk that the equation "may be written out" (by a human on paper), but because "it is somewhat complex", the math "is best performed by plugging in the numbers and letting the computer take the inverse", underscoring this point.  ('161 Patent, 51:15–27.)

### C. <u>Alice Step Two</u>: The Claims Lack an Inventive Concept Beyond the Abstract Algorithms.

Because the '161 Patent claims are directed to abstract ideas in the form of mathematical algorithms for processing data, the analysis under Section 101 then proceeds to *Alice* step two. The question to be addressed in step two is whether the claim language contains an inventive concept, such that it would transform the abstract ideas of algorithms into a patent-eligible invention.  *Alice*, 573 U.S. at 217-18.  The answer here is decidedly "no".

The specification of the '161 Patent recites only the use of generic computer technology to perform the data processing steps that are applied to sequencing data.  It includes three appendices that "provide source code for implementing the present invention", showing that ***only***

16

***generic computers are required out to carry out these steps***.  The system claims, 36, 37 and 38,

show this expressly, as they claim only "a processor" and "a computer readable medium storing

a computer program that comprises code" to perform the claimed sequence lead-lag

compensation algorithm, the field flattening algorithm, and the spectral crosstalk algorithm.

Moreover, the complaint repeatedly recites that the alleged infringement of the claims of the

'161 Patent occurs by "RTA [*i.e.*, real-time analysis] software" running on an "instrument

computer".  (Compl. ¶¶ 63, 81, 93, 94, 98.)  Consistent with the patent specification, the

complaint makes no allegations of any novel computer hardware required.  Thus, the use of

computer technology here does not "involve more than performance of 'well-understood,

routine, [and] conventional activities previously known to the industry'".  *Content Extraction &

Transmission*, 776 F.3d at 1347–48 (alteration in original) (quoting *Alice*, 573 U.S. at 225).

 Nor do the recited sequencing steps provide the necessary inventive step for *Alice* step

two.  All claims, including all three representative claims, recite the use of "sequencing a nucleic

acid by DNA sequencing by synthesis utilizing nucleotides with fluorescent dyes which are

incorporated into a complementary strand" as well as "obtaining a data set for one or more dye

intensities at one or more nucleic acid positions in said complementary sequence, wherein each

dye corresponds to a nucleotide", or a variant thereof.  The patent recognizes that this sequencing

process was known in the art.  For example, the patent incorporates by reference U.S. Patent No.

6,664,079 to Ju, which teaches DNA sequencing by synthesis through the use of fluorescent

moieties to determine the identity of nucleotides in a DNA strand.  ('161 Patent, 1:26–28, 32:45–

47. 246:37-38 (incorporating Ju by reference)).  Nothing new is taught by the '161 Patent.

 Federal Circuit precedent confirms this conclusion.  For example, in *Genetic

Technologies, Ltd. v. Merial L.L.C.*, 818 F.3d 1369, 1374 (Fed. Cir. 2016), the claims recited a

method of detecting an allele of interest on a DNA molecule by amplifying a sequence of the DNA known to be linked with the allele.  The court found the claims directed to a law of nature, and then analyzed whether the claims contained an "inventive concept" at step two.  *Id.* at 1376. The court looked to the patent specification at issue, which admitted that the process of amplifying DNA, sequencing the amplified DNA, and performing analysis of that data, were prior art and did not include an inventive concept.  *Id.* at 1377.  Here, as in *Genetic Technologies*, the recitation of techniques acknowledged by the patent as prior art—the sequencing-by-synthesis steps—cannot provide an inventive concept at *Alice* step two.  *See also CareDx, Inc. v. Natera, Inc.*, 40 F.4th 1371, 1380, 1377 (Fed. Cir. 2022) (holding claims including use of known next-generation sequencing techniques to be patent ineligible).

Certain claims, such as claim 14, separately recite taking images of fluorescent dyes to determine their intensity.  (*See, e.g.,* '161 Patent, claim 14) ("obtaining a first data set for a plurality of pixel intensities of a first raw image of a dye at a first concentration on a solid support")).  But using cameras for imaging fluorescent dyes in the sequencing by synthesis process was also known in the art, as shown in the Turcatti reference, which the '161 Patent incorporates by reference.  '161 Patent, 1:37–38 (citing the Turcatti reference as "Gerardo" for Gerardo Turcatti); 246:37–38 (incorporating Turcatti by reference); Ex. 1, Turcatti et al., A new class of cleavable fluorescent nucleotides: synthesis and optimization as reversible terminators for DNA sequencing by synthesis, Nucleic Acids Rsch., 36(4):e25 (2008) at 2 (describing the use of a Hamamatsu ORCA-ER CCD camera to image fluorescent dyes).

Additionally, the patent acknowledges that this step is performed using commercially available cameras.  (*Id.* at 30:59–67 ("By way of example only, the system may employ a high sensitivity CCD camera (such as those available from Roper Scientific, Inc., Photometric

18

division, Tucson Ariz. or those available from Apogee Instruments, Roseville, Calif.) to image the fluorescent dyes and make measurements of their intensity.  The CCD cameras may also be cooled to increase their sensitivity to low noise level signals.  These may also be CMOS, Vidicon or other types of electronic camera systems.").)  No new ways of imaging are taught.  The taking of images of the luminescence of fluorescent dyes is not inventive, and cannot satisfy step two.

Two claims recite the use of a microscope slide or silicon chip for holding the fluorescent dye to be imaged.  ('161 Patent, claim 18 ("The method of claim 13, wherein said solid support comprises a microscope slide."), claim 19 ("The method of claim 13, wherein said solid support comprises a silicon chip.").)  These are conventional laboratory tools used in a many contexts, including for holding dyes in sequencing, as shown in the Ju prior art patent.[5]  (Ex. 2, U.S. Patent No. 6,664,079, 5:42–44 ("Example where the unique labels are dyes and the solid surface *is a chip*."), 2:6–10 (" For large scale evaluation, a multi-color scanning system capable of detecting multiple different fluorescent dyes (500 nm–700 nm) (GSI Lumonics ScanArray 5000 Standard Biochip Scanning System) *on a glass slide* can be used."), claim 2 ("The method of claim 1, *wherein the solid surface is glass, silicon*, or gold.") (emphases added).)

Finally, claim 36 expressly recites generic computer hardware, such as a "processor", a "computer readable medium" and "code" that performs the steps of the algorithm.  ('161 Patent, claim 36) ("said system comprising a) a processor, and b) a computer readable medium readable by said processor, said computer readable medium storing a computer program that comprises 1) code . . . .").  These are simply generic references to a computer that cannot pass step two.

---

[5] '161 Patent, 32:45–47 ("Exemplary fluorescent moieties and fluorescent semiconductor crystals are described in Ju et al., U.S. Pat. No. 6,664,079, hereby incorporated by reference.").

There is nothing more to the invention, let alone "significantly more", *BSG*, 899 F.3d at 1290, than the use of the algorithms themselves.  The claims of the '161 Patent therefore fail *Alice* step two (as well as *Alice* step one), and are invalid.

## V.    CONCLUSION

For the foregoing reasons, Illumina respectfully requests that the Court dismiss Element's claims for infringement of the '161 Patent (Count I of the complaint) with prejudice pursuant to Rule 12(b)(6) because the '161 Patent is invalid under Section 101.

20

*Of Counsel*:

Keith R. Hummel
Sharonmoyee Goswami
Jonathan D. Mooney
CRAVATH, SWAINE & MOORE LLP
Two Manhattan West
375 Ninth Avenue
New York, NY 10001
(212) 474-1000
khummel@cravath.com
sgoswami@cravath.com
jmooney@cravath.com


Dated: November 24, 2025

  */s/ Kelly E. Farnan*
Kelly E. Farnan (#4395)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
(302) 651-7700
farnan@rlf.com


*Attorneys for Defendant*
*Illumina, Inc.*